A. M. LUCKETT, Doing Business as SOUTHERN FRUIT JULEP COMPANY, and JERSEY COMPANY, Appellants, v. ORANGE JULEP COMPANY, a Corporation, and CLAUD JOHNSTONE et al., Partners, Doing Business Under Firm Name of ORANGE JULEP COMPANY.

In Banc, June 30, 1917.

1. FORMULA: Ownership: Howel's Orange Julep: Chemist in Employ of Manufacturer. A chemist by written contract was employed to "personally supervise and attend to the manufacture

271 Mo.—19

of all extracts and syrups necessary to carry on the business" of a company manufacturing soft drinks, and agreed and bound "himself to never divulge any of the trade secrets or formulas turned over to him" by said company. At that time the company was manufacturing "Jersey Creme," and later the manager took up with said chemist the perfecting and manufacture of a new soft drink, and bought the ingredients used in experimenting, the tests being made in the company's laboratory and most of the work being done by the chemist, and as a result "Howel's Orange Julep" was manufactured and placed upon the market, and much money was spent in advertising it and many thousands of dollars' worth of it were sold, all while the chemist remained in the company's employ. He did not originate the formula, but it was the result of the combined efforts of himself and three other officers of the company, which paid for their services and for the ingredients. *Held*, that the formula belonged to the company, and the chemist had no interest in it as it existed at the time he resigned which he could transfer to others or use for his own benefit.

2. ————: ————: Injunction. And as said chemist claims to have said formula in his possession, and he and his associates are using it to manufacture and sell an Orange Julep, and he is attempting to induce patrons to believe that be alone originated the formula and that he alone can manufacture an Orange Julep in accordance with it, and said acts are injuring the company in its business, he and his associates will be enjoined from making use of the formula and they will be restrained from manufacturing an orange julep of any kind until he makes out and delivers said formula to said company.

Appeal from St. Louis City Circuit Court.—*Hon. Leo S. Rassieur*, Judge.

Reversed and remanded (*with directions*).

*Frumberg & Russell* and *Brownrigg & Mason* for appellants.

(1) Where a person is employed by a company which uses a secret process in the manufacture of its product, there is an implied contract on the part of the employee not to divulge the secret or use it for his own purposes, after he leaves the company. Pape v. Lathrop, 18 Ind. App. 643; Little v. Gallus, 38 N. Y. Supp. 489; Kodak Co. v. Reichenbach, 79 Hun, 183; O. & W. Thum Co. v.

Tloczynski, 114 Mich. 149; Peabody v. Norfolk, 98 Mass. 452; Westervelt v. Paper Co., 154 Ind. 673; Stone v. Chemical Co., 65 N. J. Eq. 759; Silver Springs B. & D. Co. v. Woolworth, 16 R. I. 732; Trice v. Comstock, 121 Fed. 620; Detinning Co. v. Can Co., 12 L. R. A. (N. S.) 102; Baldwin v. Von Micheroux, 25 N. Y. S. 857; Glass Co. v. Schnebach, 239 Pa. 76; Wiggins Co. v. Cot-A-Lap Co., 169 Fed. 150; Switch & Signal Co. v. Sperry, 169 Fed. 26. (2) Furthermore, even if during his employment he had discovered the secret of this compound, entirely by his own efforts, unaided by any other employee, but with his master's time, material and appliances, then, inasmuch as he allowed the master to advertise this product under the name of "Howel's Orange Julep," to advertise it throughout the United States to the extent of thousands of dollars, and build up a business to the extent of more than $100,000 a year, based upon that formula, by every principle of equity and fairness he would be now estopped to claim the sole proprietorship of that formula, or to claim that he had a right to go out and use it to his former master's injury. Pape v. Lathrop, 18 Ind. App. 643; Little v Gallus, 38 N. Y. Supp. 489; Kodak Co. v. Reichenbach, 79 Hun, 183; Silver Springs B. & D. Co. v. Woolworth, 16 R. I. 732; Baldwin v. Von Micheroux, 25 N. Y. Supp. 857. (3) The owner of such a secret process, though not patented or patentable, has a right to protection by injunction against one who, in violation of a contract or breach of confidence, undertakes to apply the secret to his own use, or impart it to others. Stewart v. Hook, 18 Ga. 445; O. & W. Thum Co. v. Tloczynski, 114 Mich. 149; Nut Co. v. Cramer, 134 Mich. 370; Taylor v. Iron & Steel Co., 70 N. J. Eq. 541; Harvey Co. v. Drug Co., 75 App. Div. 108. (4) Whether a trade name is capable of exclusive appropriation as a technical trade-mark, or not, and even though it be descriptive, if it has a secondary meaning as a designation of the product of a certain person, others have no right to use that name without some accompanying statement to clearly distinguish the competing product from the product originally put out under the name used. Watch Co.

v. Sanborn, 96 Fed. 330; Oxford University v. Publishing Co., 101 Fed. 443; Devlin v. Peek, 135 Fed. 167; Draper v. Scarritt, 116 Fed. 206; Globe-Wernicke Co. v. Brown, 121 Fed. 185; Knitting Co. v. Garon, 128 N. W. 288; Levy v. Walker, L. R. 10 Ch. D. 447. (5) In order to make out his case, it is not necessary for the plaintiff in a case like the one at bar to prove actual deception of the public, where a manifest likelihood of such deception exists. Fuller v. Huff, 43 C. C. A. 453, 104 Fed. 141; Pin Co. v. Berg Bros., 188 Fed. 683; Von Mumm v. Frasch, 56 Fed. 837; Malting Co. v. Malting Co., 97 N. W. 389. (6) In such a case as this, even though the defendants practiced no deception themselves, if the trade name adopted by them was such as to enable middlemen and to lead middlemen to deceive the public into believing that the defendants' product is the plaintiff's product, there is a violation of plaintiff's rights. Johnston v. Orr-Ewing, 7 App. Cas. 231; R. Hennisch's Sons Co. v. Boker, 86 Fed. 768; Gulden v. Chance, 182 Fed. 318; Von Mumm v. Frasch, 56 Fed. 835; Mfg. Co. v. Trainer, 101 U. S. 51; Nims, Unfair Competition. p. 32, sec. 18; Tobacco Co. v. Hynes, 20 Fed. 884; McLean v. Fleming, 96 U. S. 255; Fairbank Co. v. Mfg. Co., 77 Fed. 877.

*Bruce S. Elliott* and *Wagner & Miller* for respondents.

(1) As to the claim that defendants have been guilty of unfair competition in giving their product the same color as that of the plaintiffs' products, plaintiffs have no monopoly in any particular color, and certainly have no monopoly to give an orange syrup an orange color. Plaintiffs adopted no particular color as a distinguishing mark of their goods; and where defendants use the same color for their product as plaintiffs use, it must be shown that this was done with the design to market their goods as those of plaintiffs. Enoch Morgens' Sons Co. v. Whittier-Coburn Co., 118 Fed. 657; Fairbank Co. v. Mfg. Co., 75 Fed. 869; Dennison Mfg. Co. v. Mfg. Co., 94 Fed. 651; Tobacco Co. v. Larus & Bro., 133 Fed. 727; Marvel Co. v. Pearl, 133 Fed 160; Remedy Co. v. Eureka Co., 80 Fed.

105; Von Mumm v. Whitteman, 85 Fed. 966, 91 Fed. 126. (2) The formula under which "Orange Julep" is being made by defendants was not obtained from plaintiffs and was never peculiarly their property. (a) If, on the one hand, defendant Johnstone originated and owned this formula, his conduct in permitting plaintiffs to use it in the manufacture and marketing of their syrup simply gives them the right to continue to do so; but he would have an equal right with plaintiffs to manufacture and market the syrup made from his own formula, the only limitation to that right being that he must distinguish his goods from those of plaintiffs. (b) If, on the other hand, Johnstone and Howel collaborated in producing the formula, it must affirmatively appear that the information conveyed to Johnstone by Howel in the matter was not such as Johnstone would or could have acquired in the ordinary practice of his profession, before he can be enjoined from its use. Nims, Unfair Competition, p. 432; Iron & Steel Co. v. Nichols, 69 Atl. 186; Alger v. Thatcher, 19 Pick. 51; Albright v. Teas, 37 N. J. Eq. 171; Stein v. National Life Assn., 105 Ga. 821, 46 L. R. A. 150; High on Injunctions, par. 19. (3) There is no evidence that defendants are using the same formula as that used by plaintiffs, or that their product is the same product as that made by plaintiffs; and the court, therefore, has no means of knowing that they are the same. On the contrary, Johnstone swears that the "Orange Julep" now manufactured by defendants is the same product that he had made originally before his employment by plaintiffs and is the same product that he made while with the plaintiffs, and that he has never disclosed the formula for making that product to any one. Wherefore, the court is manifestly unable to say that the two formulae and the products therefrom are now the same. Baglin v. The Cusinier Co., 164 Fed. 25. (4) The words "Orange Julep," being a common name, descriptive, and incapable of exclusive appropriation, the defendants, in common with the public generally, have a right to use the words to describe their product, if in so doing they practice no deception. Descriptive terms and generic names are *publici juris* and incapable of exclusive

appropriation by any one; and even where the words have acquired a secondary meaning the subsequent users (as these defendants) have no other burden imposed upon them than to use the name (as was done in this case) in such manner as to prevent the possibility of deceiving purchasers. If, by reason of such allowable use by defendants, plaintiffs suffer any injury it is *damnum absque injuria.* 38 Cyc. 769; Varnish Works v. Fisher, 153 Fed. 928; Stationery Co. v. Dodge, 145 Cal. 380; Kroph v. Furst, 94 Fed. 150; Hot Springs Co. v. Hegeman, 138 Fed. 855; Nicholson v. Cigar Co., 158 Mo. 158; Oakes v. Candy Co., 146 Mo. 391; McCartney v. Garnhart, 45 Mo. 593; Seed Co. v. Plant Co., 37 Mo. App. 313; Wrisley Co. v. Soap Co., 122 Fed. 796; Reach Co. v. Hardware Co., 155 Mo. App. 412; Alden v. Gross, 25 Mo. App. 123. (5) The fact (if it be a fact) that defendants' "Orange Julep" could be sold to ultimate consumers at the soda fountain as or for plaintiffs' product, thereby injuring the plaintiffs, constitutes no ground whatever for interference with defendants' sale of their product; provided, that defendants have fully met the duty imposed upon them by law (as they clearly have in this case) of so labeling the immediate containers of their product that they in no manner simulate the packages or containers of plaintiffs' product. Rathbone v. Champion Co., 189 Fed. 26, 110 C. C. A. 596, 37 L. R. A. (N. S.) 354. (6) It is an absolute essential, in order to establish a case of unfair competition, that the court should find that the ordinary purchaser would be deceived into purchasing defendants' goods, believing that he was purchasing those of the plaintiffs. Scrivener v. North, 134 Fed. 366-80, 67 C. C. A. 348; Simmons Co. v. Drug Co., 93 Tenn. 84; Washboard Co. v. Saginaw Co., 103 Fed. 281; Vitascope v. Phonograph Co., 83 Fed. 30; Proctor & Gamble Co. v. Refining Co., 92 Fed. 357; Centaur Co. v. Marshall, 97 Fed. 785, 38 C. C. A. 413; Heinz v. Lutz, 146 Pa. St. 608; Pfeiffer v. Wilde, 107 Fed. 456, 102 Fed. 658; Fisher v. Blank, 138 N. Y. 452; Coates v. Thread Co., 149 U. S. 526; McDonald v. Mueller Co., 183 Fed. 972; Type Foundry Co. v. Portland Co., 186 Fed. 690; Hilker Mfg. Co. v. Map Co., 191 Fed. 613.

RAILEY, C.—On November 19, 1913, appellants filed in the circuit court of the city of St. Louis, their petition in equity to restrain defendants, and each of them, from using plaintiffs' formula and alleged *trade secret* in respect to the sale of Orange Julep, etc. The petition concludes with a prayer for general relief. A temporary restraining order was issued; defendants entered their appearance and filed an answer admitting the following facts: That plaintiff, Jersey Creme Company, is a corporation, duly organized under the laws of Texas; that defendants are residents of St. Louis, Missouri; that the business of plaintiffs has been the manufacture and sale of compounds and syrups, for the making of soft drinks, as alleged in petition; that defendants, Johnstone, Cox and Jones were in the employ of plaintiff Jersey Creme Company during the periods alleged in petition. The remainder of said answer contains a specific and general denial of the allegations of said petition, not admitted to be true as above stated. It concludes with a prayer for the dismissal of the case, for the assessment of damages, etc. The reply is a general denial.

The abstract of record covers 638 pages of printed matter; calls for numerous exhibits, and contains the testimony of twenty-four witnesses, thirteen of whom testified in the form of depositions, and the remainder were examined at the trial. In view of the voluminous record aforesaid, and in order to avoid repetition, we shall simply present a brief *outline* of the case here, and consider the evidence and main questions involved in the opinion.

We gather from the record that the Jersey Creme Company, in 1906, was a Texas corporation, doing business at Fort Worth, Texas, and engaged in manufacturing and selling a soft drink, known as "Jersey Creme," in various cities and states of the Union. About the latter part of the year 1907, the defendant Claude Johnstone was employed by plaintiffs to work in their laboratory at Fort Worth and to manufacture Jersey Creme syrup, according to the formula which they turned over to him, at the date of said employment. Johnstone was not a graduate from any school where chemistry is taught, but claims

to have received instruction through the International Correspondence School, in addition to that which he learned from his employment at different places.

On December 9, 1907, C. J. Howel, secretary and manager of the Jersey Creme Company, employed Johnstone, as above indicated, and on said date they entered into a written contract of employment, which among other things provides that Johnstone "is to take charge of the manufacturing department of party of second part and is to personally supervise and *attend to the manufacturing of all extracts and syrups necessary to carry on business of party of second part.* Party of first part is to be held responsible for the manufacturing department and must see that every gallon of Jersey Cream shipped by company is made in accordance with formula and that every package containing syrup is filled and shipped in neat and attractive packages.

*"Party of first part agrees and binds himself to never divulge any of the trade secrets or formulas turned over to him by party of second part."*

Johnstone entered into the performance of his duties under this contract and manufactured Jersey Creme Syrup until he left the service of the company in the fall of 1913. He worked for the company at Fort Worth about one year after his employment; went to Chicago, where the company had a branch business of the same kind; did the same work there for two years; returned to Fort Worth and continued his work there until he resigned in September, 1913. He made the Jersey Creme, both at Fort Worth and at Chicago, under the formula of the Jersey Creme Company. He testified in regard to this matter, as follows:

"Did you make Jersey Creme according to the formula handed you by Mr. Howel? A. To a certain extent, yes.

"Q. Just explain your answer. A. Well, the formula was *changed* from time to time, and I developed and worked on the formula and made it a little bit different from what it was at the time I went to work for them."

It appears from the testimony, that D. H. McDonald had put upon the market a soft drink called "Orange-ade," which was out-selling the Jersey Creme, although it could only be kept for *immediate use*. Howel, the manager of the Jersey Creme Company, was familiar with the McDonald Orange-ade, and was anxious to have his company manufacture and put upon the market a better soft drink, which could be sold for *future* as well as *present* use. He took up the subject with Johnstone and concluded to perfect a new soft drink as above indicated. He bought the ingredients necessary to use in experimenting, and the tests were made by Howel and Johnstone in the laboratory of the Jersey Creme Company. Johnstone did the principal part of the work, and after repeated experiments in the laboratory, he and Howel presented to Blanchard, an officer of the company, a sample of the drink which had thus been prepared, in the laboratory and at the expense of the Jersey Creme Company. Blanchard approved the drink and originated the name "Orange Julep" therefor. Thereupon Johnstone, assisted by Howel to some extent, experimented for two or three months with the new drink in the laboratory. and with the ingredients furnished by the Jersey Creme Company, for the purpose of preparing this drink to put on the market. Johnstone testified in respect to this matter as follows:

"Mr. Elliott: State what, if anything, Mr. Howel or Mr. Blanchard or Mr. Boswell did toward perfecting the formula under which Howel's Orange Julep was manufactured. A. I made up innumerable samples of syrup and we would put them away, set probably—some of them set a week, some a month. That was all during the fall of 1911, and at different times, and some of them would form a little *scum* on top; some of them would not. And during that time some of them had one kind of acid in them, and Mr. Howel and Mr. Blanchard would make suggestions about a little bit too much acid, or a little bit too much flavor, or a little bit too much color, or probably not enough, as I stated a while ago."

The drink finally agreed upon was submitted to *Blanchard,* because he was supposed to have a *truer and better*

*taste* than anyone else around the factory, and met with his approval.

Howel testified that the Jersey Creme Company spent approximately $1015 in experimenting upon the Orange Julep, and that said company, through him, bought and paid for the necessary ingredients which were used in manufacturing said Orange Julep, as it was placed upon the market.

After the formula for Orange Julep had been perfected, while Blanchard, Howel and Johnstone were present, the *first* suggested that it be called "Howel's Orange Julep." This suggestion met with the approval of both Howel and Johnstone. Thereupon Howel applied for and received, in June, 1912, a registry certificate from the United States, entitling him to use as a *trade-mark* the words, "Clayton James Howel," etc., but no certificate was applied for or issued in respect to the words "Orange Julep."

During the season of 1912 the Jersey Creme Company spent in advertising Howel's Orange Julep about $5,000, and sold during the first year a little over $100,000 worth of same. It was shipped to the fountain trade in one-gallon glass jugs, six in a crate, and to the bottler in twenty-five and fifty-gallon barrels.

The plaintiffs obtained label registration, with "Howel's Orange Julep Syrup " printed thereon, but such registration did not in any manner protect the use of the words "Orange Julep." Small labels were given to the bottlers, and they put them on the bottles in carbonated form. The larger labels, containing the same words, were placed on the one-gallon bottles used by plaintiffs.

It appears from the evidence that about the first of January, 1912, T. E. Blanchard, W. G. Newby and W. C. Stribling formed a private partnership which they designated as "Southern Fruit Julep Company," as a *sales agent* to market Howel's Orange Julep. The Southern Fruit Julep Company was owned by the Jersey Creme Company and all of its bills were paid by the latter. It was brought into existence as a matter of convenience, for the purpose of advertising and selling the Howel's Orange

Julep, separate and apart from the Jersey Creme. Whatever rights Howel acquired under the registrations aforesaid were assigned to the Jersey Creme Company.

After the formula for making Howel's Orange Julep was finally perfected, and about the first of January, 1912, plaintiffs began to market said julep; sent out thousands of letters to dealers all over the country, with the above trade-mark and name, exploiting said drink soliciting business, etc. They also sent out through salesmen, for the benefit of customers, handsome glass signs and lithographs on the packages bearing their trade-mark and name. They received orders for Howel's Orange Julep from all parts of the United States and Canada. Mr. J. B. Hogsett, director and secretary of the Jersey Creme Company, testified that Howel's Orange Julep, since 1911, had been advertised at an annual expense of from $10,000 to $20,000. J. S. Boswell, a regular graduate in chemistry, put up and sold Howel's Orange Julep for plaintiffs at Chicago, Illinois, during the year 1912. He estimated that from June, 1912, to June, 1913, he made and shipped out from Chicago about 50,000 gallons of Howel's Orange Julep.

During all the time that Johnstone was in the service of plaintiffs, while engaged in manufacturing Howel's Orange Julep, and while experimenting and perfecting the formula for Howel's Orange Julep, *he never claimed* to any of the plaintiffs, or to the officers of the Jersey Creme Company, that he was the *originator* of the formula for Howel's Orange Julep, nor did he inform any of them that he claimed any interest in said formula.

About September, 1913, defendant Johnstone resigned his position, left the service of plaintiffs, and in conjunction with the other defendants attempted to obtain a charter from the State of Missouri to manufacture and sell Orange Julep in St. Louis, Missouri. The charter had not been obtained at time of trial below, but said defendants had obtained from the United States a certificate of registry for the name of ''Johnstone.'' The latter, and his associates as co-partners, then commenced manufacturing and selling Orange Julep in St. Louis, Missouri,

under the name and style of "Orange Julep Company," with a label containing the words "Orange Julep Syrup manufactured by the Orange Julep Company, Johnstone's Orange Julep, trade-mark, The Original."

Defendant Johnstone, at the instance of counsel, testified as follows:

"Mr. Elliott: I will ask you to state, Mr. Johnstone, if the orange syrup you are now manufacturing as Johnstone's Orange Julep is the same or different from the orange syrup made by you for the plaintiffs and sold as Howel's Orange Julep? A. It is the same syrup that I made originally, and necessarily would be the same I made for the Jersey Creme Company."

J. S. Boswell, a regular graduate in chemistry, who had charge of plaintiffs' plant at Chicago, and who was at time of trial the chemist of plaintiffs in charge of their laboratory at Fort Worth, Texas, testified as follows:

"Q. Is the Orange Julep as you are now making it the same, in your judgment, as it was made or being made at the time Mr. Johnstone left the employ of the plaintiff companies? A. Yes, sir.

"Q. Is the Orange Julep you are now making the same, in your judgment, as the Orange Julep you were making at the time you left Chicago? A. Yes, sir.

. . .

"Q. Are you making this Howel's Orange Julep now, in the same manner as you did when Mr. Johnstone left the employ of the plaintiff company and you took charge? A. Yes."

It clearly appears from the evidence that some, if not all the defendants, have repeatedly sought to obtain the trade of those who bought Howel's Orange Julep, by inducing them to believe that Johnstone was the originator of the formula which manufactured said syrup; that the plaintiffs did not have said formula and that they could no longer manufacture Howel's Orange Julep as it was made when Johnstone was in the employ of plaintiffs and manufactured the same. It is likewise clear to our minds that plaintiffs have lost a portion of their original trade and that the same has gone to defendants on account of

the matters above mentioned. The defendant Johnstone still claims to be the *originator* of the formula which manufactured Howel's Orange Julep, as well as the *sole possessor* of same, and by advertising accordingly in continuously making inroads on the trade of plaintiffs, in selling the Orange Julep claimed to have been manufactured by them under said formula.

Such other facts disclosed by the record as may be necessary will be considered in the opinion.

On February 3, 1914, the trial court found the issues in favor of defendants, dismissed plaintiffs' bill, and entered its judgment accordingly. Plaintiffs filed their motion for a new trial which was overruled and the cause duly appealed by them to this court.

We have carefully read and fully considered the voluminous record and briefs on file in the case. In view of the conclusion which we have reached, in respect to the facts, it will not be neecssary to consider all the questions raised and discussed by the respective counsel. We have a very high regard for the legal ability of the judge who tried this case, but as we are required to pass upon the weight of the evidence, and as fully half of the witnesses testified by deposition, we see no good reason for deferring to the conclusions of the trial court in disposing of the case as a whole.

I.   Is the contention of defendants, that Johnstone originated the formula under which he manufactured Howel's Orange Julep while in the service of the Jersey Creme Company, sustained by the record? Johnstone testified that he originated the formula used in

Ownership of Chemical Formula.
manufacturing Howel's Orange Julep, *before* he went into the service of the Jersey Creme Company; that he made an orange syrup for the soda fountains of the two stores of Yeager Drug Company of Mineral Wells, Texas, and for the Kendall-Clark Drug Company at Fort Worth; that the syrup at both places was made from the fruit; that the former did not sell the syrup, but served it at the fountain; that the Kendall-Clark Drug Company sold *concentrated orange syrup*.

Even if Johnstone's evidence be true, that he did sell syrup under the above circumstances, it would be wholly insufficient to show that he used the same formula as that used after months of experiment with Howel's Orange Julep, in making a *finished* product, which did not require *immediate* use. Johnstone, however is flatly contradicted by K. D. Holland, who was president and general manager of the Kendall-Clark Drug Company, and who employed him as an order clerk. Holland testified that *he* originated the formula used by the above firm for making orange syrup; that said firm never put up any orange syrup that was made by Johnstone; that Johnstone never manufactured in their laboratory any orange syrup that was put up by the company; that Johnstone never originated any formula for making orange syrup while he was with said firm; that the formula which was used belonged to said company.

Theodore Mack, an attorney of twenty years standing at Fort Worth, testified that he was introduced to Johnstone on May 29, 1913, at Fort Worth, while the latter was in plaintiffs' laboratory where the Orange Julep and Jersey Creme were compounded. He testified that Johnstone told him *that he did not prepare the formula for the Orange Julep but had improved it some; that the formula belonged to the company.*

Johnstone's contract of employment with the Jersey Creme Company required him to take charge of the manufacturing department and *"to personally supervise and attend to the manufacturing of all extracts and syrups necessary to carry on business of party of second part."*

He knew that the Jersey Creme Company was the owner of all the Howel Orange Julep manufactured by him, and that he was paid by said company for his services. It was just as much a part of his duty under said contract to manufacture the Orange Julep, as it was the Jersey Creme. He makes no claim to the formula of the latter, although he said he changed and improved the same after his employment. He made *no claim* to the officers of said company, while experimenting and manufacturing Orange Syrup, that he *had* or *owned* any formula for making

same. On the contrary, he agreed with Howel and Blanchard that it should be called "Howel's Orange Julep." He knew that Howel had applied for and received the trade-mark heretofore mentioned, and that goods to the amount of $100,000 had been manufactured by him and shipped to various points in the United States and Canada, as "Howel's Orange Julep." He knew that the company for which he was working was annually expending from $10,000 to $20,000 advertising Howel's Orange Julep. He knew that the Jersey Creme Company was not only paying *his* wages, but likewise all the expenses for manufacturing and marketing Howel's Orange Julep. In other words, he stood *silently by,* while his company was spending thousands of dollars in advertising, making and selling Howel's Orange Julep on the theory that it was the undisputed owner of the formula under which said goods were made without making the slightest protest, or even suggesting, that he had any interest in said formula.

When Johnstone resigned in September, 1913, he told Luckett he would fix them up with the formula for *all* the syrups they had been making, so they could go ahead and manufacture same. He testified that he intended to give plaintiffs all the information in his power. He still made no claim to any interest in either of said formulae. After his resignation, however, he then talked with Luckett, and demanded $1,000 for the formulae. He had claimed to Mack and others that he had improved the orange formula; and also claimed that the plaintiffs did not have the true formula under which he had manufactured the Howel's Orange Julep. The plaintiffs were willing to pay him a consideration for the formulae as *improved,* if Johnstone would write them out in his own handwriting. He declined to do so, but kept the unsigned agreement which plaintiffs offered to sign; used the same to back up his contention, that they recognized him as the owner of Howel's Orange Julep formula, and is still asserting that claim in this court. He admits that he *deceived* Howel— when the latter called upon him for a copy of the Orange Julep formula to turn over to his successors—by giving him false information as to the Orange Julep formula.

Johnstone said that Howel, after selling his stock, told him they would have to get up some formulae to turn over to his successors, as they wanted them. He then testified as to what occurred as follows:

"I told him a few things *that I wanted him to know*, and purposely misled him and did not give him any formulae or any of the secret processes that I had used in making Orange Julep."

He not only deceived Howel, but did not furnish the plaintiffs any formulae. Even if he was afraid Howel might use them in his business, this was no excuse for failing to deliver the same to *plaintiffs*.

Without pursuing this subject further, we are satisfied from the record before us that Johnstone never *originated* the formula for making Howel's Orange Julep, before he entered the service of the Jersey Creme Company; that the formula finally agreed upon for said syrup as a *finished product*—which could be stored and sold in the future—was produced by the joint collaboration of Johnstone, Howel and Blanchard, while all three were working for the Jersey Creme Company, and being paid by the latter for such service; that all the ingredients which entered into the manufacture of Howel's Orange Julep were paid for by the Jersey Creme Company; that all the expenses for making and selling said Julep were paid by said company. In short we are satisfied from the evidence that when Johnstone retired from the service of plaintiffs in September, 1913, he had no interest whatever in the formula for making Howel's Orange Julep, as it existed before he resigned, and that said formula is the sole property of the plaintiffs. The conclusion thus reached is abundantly supported by the following authorities: Gill v. United States, 160 U. S. 426, and cases cited; Westervelt v. National Paper & Supply Co., 154 Ind. 1. c. 678-9, and numerous cases cited; O. & W. Thum Co. v. Tloczynski, 114 Mich. 149; Silver Spring B. & O. Co. v. Woolworth, 16 R. I. 1. c. 732; Macbeth-Evans Glass Co. v. Schnelbach, 239 Pa. St. 76; Vulcan Detinning Co. v. Am. Can Co., 12 L. R. A. (N. S.) 102; Peabody v. Norfolk, 98 Mass. 452; Tabor v. Hoffman, 118 N. Y. 30; Salomon v. Hertz, 40 N. J. Eq.

400; Eastman Kodak Co. v. Reichenbach, 79 Hun (N. Y.), 183; Story's Eq. Jur., sec. 952; High On Injunctions (2d Ed.), secs. 19, 1108; Beach on Injunctions, secs. 35, 924-5.

The defendant Johnstone claims to have in his possession the formula under which Howel's Orange Julep was manufactured by him, when in the service of the plaintiffs.

Injunction.

He and his associates are using this formula to manufacture and sell the Orange Julep marketed by the defendant Orange Julep Company, in violation of plaintiffs' rights, and are illegally attempting to induce the patrons of the latter to believe that the formula for making Howel's Orange Julep was originated by said Johnstone, and that he alone can manufacture Orange Syrup in accordance with said formula. It appears from the evidence that the acts of said defendant are injuring plaintiffs in their business. Under the authorities heretofore cited the plaintiffs are entitled to equitable relief against such wrongs, and injunction is the appropriate remedy to right the same.

We therefore reverse and remand the cause with directions to the trial court to set aside its judgment and all its proceedings thereunder; to enter a decree in favor of plaintiffs, enjoining said defendants and all others claiming under them, from manufacturing or selling any Orange Julep made under the Howel's Orange Julep formula aforesaid; and also requiring that said Johnstone shall make out and deliver to the president or secretary of said Jersey Creme Company a true statement in writing, containing an accurate copy of the Howel's Orange Julep formula aforesaid, within a reasonable time; and that the defendants and each of them, shall refrain from making or marketing Orange Julep of any kind or under any formula, until said requirement is complied with by said Johnstone.

*Brown, C.*, concurs.

PER CURIAM:—The foregoing opinion of RAILEY, C., in Division One, is adopted by the Court in Banc as the opinion of said court. *Graves, C. J.*, and *Walker, Faris* and *Woodson, JJ.*, concur; *Bond, Blair* and *Williams, JJ.*, dissent.