ULTRA-LIFE LABORATORIES, INC., RESPONDENT, v. L. W. EAMES, APPELLANT.—221 S. W. 2d 224.

Kansas City Court of Appeals. Opinion delivered May 9, 1949.

*Haysler A. Poague, Barkley M. Brock* and *Poague, Poague & Brock* for appellant.

George H. Miller and Harold G. Baker for respondent.

BOYER, C.—This is an action in equity for injunctive relief from the violation by defendant of his contractual obligations. Plaintiff obtained a final judgment by the terms of which defendant was restrained from teaching or disclosing trade secrets of the plaintiff re-

lated to a certain method and process for the culling of chickens known as "Eamesway" and which had been taught and was being taught in the Eames Institute of Poultry Technology, an institute then owned by the plaintiff. Defendant was further restrained from the use of the names and terms "Eamesway" and "Eames Institute of Poultry Technology" and from soliciting and advertising in any manner to teach said method of culling poultry under any name or names whatever.

The defendant has duly appealed. The points for consideration presented in his brief pertain only to claimed errors in the findings of fact and conclusions of law made by the trial judge. The adequacy and propriety of the pleadings are not questioned, and although they are somewhat extended a brief reference thereto will suffice for an understanding of the issues which are raised thereby.

The amended petition states that plaintiff is an Illinois corporation with offices in East St. Louis; that it is and for many years has been engaged in the business of manufacturing and selling poultry feeds, concentrates, medicines, and remedies under the names of "Ultra-Life Feeds" and "Ultra-Life Poultry Concentrates" in connection with which it gathers and distributes to its customers and their patrons information regarding the breeding, care, feeding and culling of poultry; that in the spring of 1936, plaintiff learned that the defendant was using a method and process for culling chickens wherein by means of a physical examination and internal palpation of the organs, it could be determined whether or not a chicken was capable of and was producing eggs, and whether or not it would be profitable to retain said chicken in a flock as a producer of eggs: that thereafter defendant was employed by plaintiff to demonstrate his method and process under the sponsorship and supervision of plaintiff, and defendant was to devote his entire time to the business of plaintiff after September 1, 1936, except he was to be at liberty during the hatching period to operate his hatchery at Forest City, Iowa; that while defendant was engaged by plaintiff he developed and perfected his method of internal culling; that defendant desired to establish a school for the purpose of teaching his method and process and in 1938, in partnership with one C. W. Gates, he established the Eames Institute of Poultry Technology under the sponsorship of the plaintiff; that plaintiff spent large sums of money advertising the Eames method and furnished facilities for the conduct of the school; that the Eames method of culling poultry became identified with plaintiff's products; that prior to June 10, 1940, defendant and his partner were in disagreement and the partnership was dissolved, and as of that date plaintiff for valuable consideration acquired all the right, title, interest and privileges theretofore derived and to be derived from said Eames Institute of Poultry Technology; that both of said partners assigned all their right, title, interest and privileges in said partnership, including the names "Eames-Way" and "Eamesway" which

were then used in reference to said method and process, to plaintiff and agreed not to teach, disclose or sell any information considered trade secrets concerning said method and process for a period of twenty years except to plaintiff; that thereafter defendant was employed by plaintiff, and in the course of said employment conducted schools wherein said method was taught under the name "Eamesway" to certain selected persons, and the Eames Institute of Poultry Technology continued as a department or division of plaintiff's business and was so advertised at great expense, with the knowledge and consent of defendant; that defendant continued in the employ of plaintiff until April 30, 1947, at which time he voluntarily left the employ of plaintiff to engage in the operation of a hatchery and to sell a spraying device; that on or about July 22, 1947, the defendant, in violation of the terms of his said contract dated June 10, 1940, proceeded to conduct schools under the name and style of Eames Institute of Poultry Technology, or a name or names similar thereto, where he taught said method and process, advertised said schools and said method and process; that he solicited students for said schools from lists of prospects compiled by plaintiff which said lists were the property of plaintiff; and in the course of such advertising identified himself as having been associated with plaintiff in the operation and conduct of said Eames Institute of Poultry Technology; that prior to August 11, 1947, defendant announced his plans to open and conduct a school under the name of Eames Institute of Poultry Technology, or a name or names similar thereto, in the town of Clinton, Henry County, Missouri; that he advertised for students to attend said school in violation of his contract and contrary to the right, title and interest of the plaintiff. The petition concludes with an allegation of facts showing the lack of an adequate remedy at law, and that unless defendant is restrained plaintiff will suffer irreparable damage.

The answer of defendant admits the execution of the contract of August 1, 1938, and of the contract dated June 10, 1940, and denies all other allegations. The answer alleged that the contract of June 10. 1940, was executed in the State of Illinois and the validity and construction thereof will be governed by the law of that state; that said contract is void and of no effect because its provisions are contrary to public policy and in restraint of trade; that the petition failed to state a cause of action; that plaintiff did not have any proprietary right or any other right in the Eames method of internal culling of poultry; that plaintiff is not engaged in the business of teaching methods of culling poultry and therefore could suffer no damages; that no trade secrets were actually sold and delivered to plaintiff; that the internal culling of poultry is not a secret, but is known to divers other persons; that the contract is illegal because it violates the antitrust laws of the United States and of the State of

Illinois, and because it attempts to create a monopoly on behalf of the plaintiff. Defendant alleged damages to him in the sum of $10,000, and prayed the court to increase the injunction bond to that amount.

Plaintiff's reply to the answer alleged that defendant was estopped by the contract to deny the existence of a trade secret; that for more than six years after the execution of the contract Eames remained in plaintiff's employ and saw plaintiff spend large sums of money in advertising, teaching and developing Eamesway, and in making Eamesway an integral part of its business; that during all of that time the defendant treated the method of internal culling of poultry as a trade secret belonging to plaintiff, with the knowledge that plaintiff considered it a trade secret.

The trial of the case covered a period of several days. The transcript of the proceeding is presented here in three volumes consisting of more than one thousand pages. In addition thereto, more than one hundred exhibits are submitted for examination by the court. It is quite impractical, as well as unnecessary, to attempt a statement of all the facts shown by the evidence in the case. However, an adequate statement of the substance of all the evidence relative to the questions raised will be made. The salient and controlling facts will be presented, and we will avoid any excursion into the labyrinth of irrelevant matter which has contributed to the size of the transcript.

The larger portion of the most important evidence is not in dispute. Where there is controversy it will be noted. The evidence shows that the plaintiff is an Illinois corporation with its place of business in East St. Louis. It manufactures vitamin concentrates for poultry and livestock feeds which are sold to feed manufacturers, poultry men and others who use the same in making and mixing different feeds which they use or sell to the ultimate consumers. Plaintiff does not sell direct to the consumer. It does a large volume of business, of which four-fifths is in vitamin concentrates. Defendant lived at Forest City, Iowa, where he was born. After he completed his sophomore year in high school and when he was fifteen years of age, he started in the poultry business. He read all bulletins obtainable in reference to the anatomy of the chicken and learned to cull chickens by observation of their external characteristics in the conventional manner known as the Hogan System, which consists mainly of an external examination of the bird and the various characteristics that could be observed therefrom. Chickens are culled to determine which birds will lay eggs and will be profitable breeders and layers. Defendant had a hen that would go on the nest but would not lay an egg. By experimenting with her he inserted his finger in the vent of the bird and discovered the existence of a tumor. This led to further experiments and study which extended over a protracted period. By 1933, he had learned that by manipulating his finger around on the inside

of the bird he could feel its various organs and could determine a normal from a defective bird. He posted many birds that he killed in order to learn exactly the size and feel of the various organs.

In 1935, defendant opened the Eames Hatchery in Forest City, Iowa, and at that time he was using internal culling on his own flock and the flocks of others. While he was operating his hatchery, he wrote to plaintiff concerning its products. Early in 1936, O. W. Jones, an employee of plaintiff, called to see defendant and found him engaged in culling chickens. Eames told Jones he was the originator of a method whereby he could examine a chicken and tell if there was anything wrong with it on the inside, even though the defect was the size of a pencil point. He culled out a number of chickens. Jones was very much interested in the process and upon inquiry as to what was wrong with the birds which were set aside, Eames would tell him of the internal defects. To verify this, Jones bought a number of chickens, killed them, and upon examination found the internal defects to be exactly as described by Eames. Jones was very much impressed with this demonstration and reported what he had found to plaintiff. Eames was invited to go to East St. Louis for a conference with plaintiff's officers. He did so and told them he had invented and discovered the system and was the founder of it; that it was new and different, and that no one else knew how to do it. He demonstrated his method and process to the officers of plaintiff in the same manner as he had done for Jones, and they were equally surprised and amazed at the results. They then entered into an oral agreement with Eames that under no circumstances and for no consideration would he teach, disclose or sell his system to any other person, and he was immediately employed and put on the payroll of plaintiff.

Eames desired to open and operate a school in order to teach and train others his system of chicken culling. Plaintiff's officers were not willing at that time to sponsor the operation of a school. They desired first to ascertain the practicability and efficacy of teaching said method of culling to others, and whether the system might be favorably received by poultry men, and if so to build up Eames' reputation so he would have a following and be able to operate a school. With this in view, it was arranged that Eames should put on a demonstration in space provided for the plaintiff at the International Baby Chick Association convention held in Kansas City in 1936. The result of this demonstration was such that it attracted public attention and some customers for the plaintiff. Public acceptance was such that Eames and plaintiff continued numerous demonstrations at the place of business of plaintiff's customers who were feed manufacturers in communities where poultry was raised. These demonstrations were conducted at numerous places in a great number of states. A representative of plaintiff in the territory where a

demonstration was given would be with Eames and the demonstrations were used to create an interest in plaintiff's products. In the course of such demonstrations, Eames kept his particular technique undisclosed. These demonstrations continued until December 1937, when defendant suffered injuries in an automobile accident and was incapacitated for a number of months. From 1936 to 1938, Eames and his methods were widely and extensively publicized in many ways at the expense of plaintiff. After defendant recovered from his injury he was unwilling to continue traveling and was insistent upon starting a school to teach his method of culling. Plaintiff had become convinced that the Eames system would have public acceptance and could be taught. As a result of various conferences the defendant and C. W. Gates, who was also employed by plaintiff, formed a partnership to be known as the Eames Institute of Poultry Technology, the purpose of which was to operate and maintain a school for the training of poultry technicians. On August 1, 1938, the partnership entered into a contract with the plaintiff. The outstanding provisions of this contract are the following: It recites that plaintiff was interested in promoting the school, and the partnership was interested in encouraging the use of plaintiff's products; that it should be binding as long as plaintiff engaged in the manufacture of feed and cooperated with the partnership; that the partnership in operating the school would recommend the use of plaintiff's feed and have a clause in the students' contracts requiring the students to recommend the use of plaintiff's products; that both parties would cooperate in determining where students of the school should work; that plaintiff was to assist the partnership in advertising the school and would not sponsor any other such school; that plaintiff would recommend the school and give aid and advice, and that no one else would be permitted to sponsor said school.

Plaintiff did not have sufficient room in its buildings to provide space for the school, and to provide such space it constructed a second story on its office building. The partnership embarked upon this venture under the sponsorship of plaintiff which continued its advertising campaign for their mutual benefit. Eames and Gates prepared a form of contract to be signed by them and the students who enrolled in the school. This form of contract was copyrighted. By this contract the student agreed to pay one hundred dollars for his tuition, for which the partnership would school the student in the Eames method of culling chickens, and in breeding, flock selection, nutritional work, vaccination, blood testing, caponizing, sexing, preservation of diseased specimens, and general poultry management; that the student would faithfully attend classes and perform his work, and upon graduation he was to be furnished a certificate showing he was qualified to practice as an Eames poultry service technician, and for five years thereafter he was to abide by the rules, regulations and instructions

of the school; that he was to charge for culling not less than two and one-half cents per fowl, of which one-half cent was to be remitted to Eames and Gates; that he would at no time teach the Eames method to any person or persons, or conduct any class or classes for that purpose; that in practice he would recommend the use of plaintiff's products; that he would not solicit pupils for any other school, and would furnish a surety bond to the school containing such words and in such an amount as would be approved by Eames and Gates who had the right to renew the agreement for an additional five years.

The operation of the school by the partnership resulted in a financial failure. The revenue from the enterprise was wholly insufficient to meet the expenses and the partnership became indebted to plaintiff in a substantial sum. The income did not reach the expectations of the partners because of a limited number of students and the failure of practicing technicians in the field to make reports and remittances in accordance with their agreements. Defendant and his partner proposed to sell the business to plaintiff and contracts for the sale were drawn by a law firm in East St. Louis which had handled the drafting of the contracts pertaining to the school at the time of its organization. There was a separate contract drawn for each partner to sign providing for the sale and transfer of all his right, title and interest in the business. These contracts were submitted to plaintiff's officers and they were asked to purchase the school. The separate contracts were finally signed by all the parties thereto. The contract with Eames reads in part as follows: "L. W. Eames, an operator of the Eames Institute of Poultry Technology, in consideration of the premises herein, hereby relinquishes all rights, title, interest and privileges heretofore derived and to be derived from said Eames Institute of Poultry Technology, and in and to a certain agreement entered into between Ultra-Life Laboratories, Inc., and L. W. Eames dated the first day of August 1938, and assigns such right, title, interest and privileges to Ultra-Life Laboratories, Inc., and further agrees not to teach, disclose or sell any information considered trade secrets in the conduct of the Eames Institute of Poultry Technology for a period of twenty years, except to Ultra-Life Laboratories, Inc." It is further provided that "in consideration for the foregoing, the Ultra-Life Laboratories, Inc., agrees to cancel all indebtedness due them by said Eames Institute of Poultry Technology and further agrees to employ at reasonable monthly remuneration, to be agreed upon from time to time, the services of L. W. Eames in whatever capacity is to their advantage. That it is the mutual desire of the parties hereto to keep an employer-employee relationship existing between the parties for as long a period of time as in the opinion of both of the respective parties such relationship is mutually advantageous." The contract was dated June 10, 1940, and was duly signed, subscribed and sworn to. An exactly similar agreement was

made with Gates. The amount of indebtedness cancelled as a consideration for said contracts was $1958.37.

After the execution of these contracts the school was operated by plaintiff, with defendant acting as manager. Eames continued in the employ of plaintiff until April. 30, 1947, and from time to time received increases in salary and commissions. After the execution of his contract of sale and up to April 30, 1947, he received in salary and commissions an aggregate of $32,643.23, and in addition thereto a group life insurance policy for $6000; participation in a profit sharing plan; was allowed to buy stock which increased in value, and was paid all his traveling and other expenses. While the school was being operated by Eames and Gates, bulletins were prepared by Eames and were distributed to the graduates of the school. These bulletins continually warned that the methods of the Eames system should not be made known, and the students were warned against showing ''the highly technical parts of the work'' and were told that ''we want to reserve these things for ourselves.'' Similar bulletins continued under the authorship of Eames after Ultra-Life took over the school. In some of these bulletins the graduates were urged to keep the matter of internal culling a secret, and in one bulletin it was stated that only at the Eames Institute of Poultry Technology could the Eamesway methods be learned. In the development of the school, he prepared a prospectus published under the name ''Eames Institute of Poultry Technology, a division of Ultra-Life Laboratories, Inc., East St. Louis, Illinois.''

The testimony in behalf of plaintiff in reference to expenditures in advertising, promotion and development of Eamesway and the Eames Institute of Poultry Technology from 1940 to 1946, estimated such items to be in excess of $152,000, and that plaintiff considered the school a valuable asset in its business.

The testimony as to whether or not defendant represented to students and others that the Eames method of culling chickens was secret or a trade secret was conflicting. Defendant denied that he ever told any of plaintiff's representatives that it was a trade secret. He said he did develop the method which he used and which he called Eamesway, but that he did not discover internal culling.

Many witnesses testified that defendant claimed his method was a secret. P. C. Blaeuer, a former student of defendant, testified that defendant said he was the founder and originator of the system and he told students there were certain phrases they were never to divulge, and that the defendant termed them ''trade secrets.'' The president and vice-president of the plaintiff company testified that defendant told them he was the founder and no one else knew the method. Mr. George V. Staley, an extensive hatchery man and former student, testified that defendant said it was a trade secret and should not be divulged to any other person. A former student, Ivy L. Gibson, tes-

tified defendant said it was a trade secret; Robert A. Richter, a former student, testified that the defendant used the term "trade secret." There were also other witnesses who testified that defendant referred to his system as a secret.

After leaving the employ of plaintiff, defendant attempted to re-adjust and rehabilitate the finances of a hatchery in which he was interested at O'Fallon, Illinois, in which undertaking he was not successful. Thereafter, he announced his purpose of organizing and conducting a school where the Eames system of internal culling would be taught. Cards to that effect were circulated by Eames, and he later advertised that he intended to conduct classes in his own organ-ization where the Eames system of culling would be taught, and that such classes would be held throughout the country. He requested in-quiries to be directed to him at his headquarters at O'Fallon, Illinois. He commenced the first of these classes at Clinton, Missouri on April 10, 1947, with eleven students. This suit followed and a temporary injunction was issued. After being served with the writ, defendant moved his school to Kansas City, Kansas, where he continued the school with nine of the students from Clinton, plus other new students enrolled. He also conducted another school at Georgetown, Texas with seven students.

There was evidence on behalf of defendant that prior to June 10, 1940, he had taught his method of culling to various persons, all of whom were his employees except a brother-in-law, who had entered into a partnership with him to operate his hatchery. All of these but one, and his brother-in-law, attended the school and signed the stu-dent's contract.

There was also evidence that other people, through independent means and from their own experience, had learned a system of internal culling. A Mr. Roberts of Indiana stated that he had developed a method of internal culling; that he had trained no one except the men who had worked for him, and he stated that he and these men had always treated his method of internal culling as a secret. A Mr. Peters and two of his sons were engaged in the hatchery business in Iowa, and they had been doing internal culling according to their own methods. The father stated that his two sons helped him, and that they had not divulged the method to any one except their own employees.

Plaintiff, in rebuttal, offered A. G. Peters, one of the sons, as its witness. He testified that their method of internal culling had never been divulged except to their own employees. According to an offer of proof, witness would have testified that their employees were re-quired to keep the matter secret under an employment contract.

Defendant offered two witnesses who were connected with the veterinary department of the College of Agriculture at the State University. A. J. Durant testified that he was co-author of a treatise

on the diseases of poultry; that the discovery of abnormalities in chickens by internal palpation was of recent date and since the development of the study of diseases; that Eames was the first man he had heard of doing internal palpation for culling of chickens; that his practices are of general knowledge in the profession, and that there isn't anything secret about the system that he knows of. Quinton Kinder, professor of poultry husbandry, said that he had done internal examination in a limited way; that he started it before he ever heard of Eames; that Eames described his method and there wasn't anything new or revolutionary in what he said. He also said he had never heard a description of that sort before. Both of defendant's witnesses testified that the university does not teach anything on the subject of internal culling of poultry.

Throughout the testimony of defendant himself there are repeated references to the distinctive nature and character of Eamesway methods and processes. A booklet prepared by him contains these statements: "The field for Eamesway service is uncrowded. It is a new science with sound, practical principles and the work is in great demand by prospective customers who are hatcheries, breeders and all poultry producers. * * * The fundamentals of Eamesway include all of the reliable methods of other respected systems, plus many new exclusive improvements." He also stated: "My system is new; certainly it is new; it is different than it is commonly practiced." He described in great detail the routine of his internal examination and also emphasized the importance of external examination in connection with it, and said: "As much of the examination is given on the outside as given on the inside." He also described his method as a correlated system of all the facts and information which he could obtain from both external and internal examination. He denied that he had ever stated to students or any one else that his method was a secret process, but did admit that in communications to technicians and others he might have made reference to the term "trade secrets" and the desire to "keep it to ourselves." In reference to the student contract, he said it was to "protect our business" and that Gates, his partner, had it copyrighted.

Defendant testified that he never saw the contract of June 10, 1940, until he was asked to sign it, and at that time plaintiff's officers said: "This is it or we don't go ahead with the program." Plaintiff's evidence was to the effect that defendant and his partner had the contract prepared and presented it to the *Company with the request that plaintiff take over the business and relieve them of their financial obligations. Defendant said that when he was served with the writ of injunction he cancelled the school he was conducting at Clinton, Missouri and re-enrolled another school at Kansas City, Kansas, with sixteen students, nine of whom were from Clinton. He also admitted that he conducted a school with seven students at Georgetown, Texas.

At the close of the evidence the case was held under advisement and after consideration of the briefs and argument of counsel, together with a request for findings and conclusions, the court entered its final judgment and decree restraining the defendant in the manner indicated in the preceding statement. Extended findings of fact were made according to the dominant facts shown by plaintiff's evidence. The court found all issues joined for trial in favor of plaintiff; that the equities of the case were in favor of the plaintiff, and that plaintiff was entitled to the relief prayed. The court further specifically found that Eames had at all times treated and considered his method and process a trade secret and in advertisements, letters, and other writings prepared by or under the supervision of defendant, said defendant had repeatedly stated and asserted that he was the originator and developer of said method and process which was new, revolutionary, and highly efficient. The court found that defendant had violated his contract of June 10, 1940, contrary to the right, title, and interest of plaintiff. In stating his conclusions the court said: "The method and process for the culling of chickens discovered and originated by the defendant, L. W. Eames, wherein by physical examination, including external manipulation, internal palpation of the organs, inspection of the eyes, a study of its anatomy, and a compilation of information, consists of more than mere skill and was a new combination of facts and was and is a trade secret and treated by all parties as such."

The brief on behalf of appellant presents two principal points for consideration in an effort to show error in the findings and judgment of the court. First, that plaintiff did not prove a trade secret existed. Second, that the contract he is charged with having violated is void and against public policy. In reference to the validity of the contract, and in the course of the argument, the following admissions and statements were made by counsel for appellant: "In order to clarify defendant's position may we state that we are in complete accord with the plaintiff's contention that trade secrets may be sold and the buyer may take a covenant from the seller that the seller will not disclose the trade secrets to any other person. Such contracts are not in restraint of trade." And this further statement in connection with the argument that the contract is unduly restrictive: "The plaintiff says that an employer or vendee can take a covenant against the disclosure of a trade secret without any limitation as to time or space. This is true where there is actually a trade secret." The principal authorities cited by appellant to sustain his contention that the contract is void and against public policy are not in point because no trade secret was involved in those cases, all of which is clearly shown in the case of Larx Co. v. Nicol, 28 N. W. (2d) 705, 711, wherein the Supreme Court of Minnesota in considering the validity of an Illinois contract, with extended compilation of author-

ities, held the law to be to the same effect as that admitted by appellant in his last quoted statement. It is thus seen that the validity of the contract is made to depend upon the existence or non-existence of a trade secret being involved in the sale and transfer of defendant's business to the plaintiff. Addressing attention to that question, appellant says that the court must determine first whether or not internal culling of poultry is a trade secret. That is not stating the problem as we understand it. So far as the existence of a trade secret is concerned it is not a question whether internal culling is such, but whether the Eames system and process is a trade secret. Probably the best and most generally accepted definition of a trade secret is the following from the Restatement of the Law of Torts, Sec. 757 (b), where it is stated: "A trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business and which gives him an opportunity to obtain an advantage over competitors who do not know or use it." Further on in the same section is the following: "Some factors to be considered in determining whether given information is one's trade secret are: (1) the extent to which the information is known outside of his business; (2) the extent to which it is known by employees and others involved in his business; (3) the extent of measures taken by him to secure the secrecy of the information; (4) the value of the information to him and to his competitors; (5) the amount of effort or money expended by him in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others."

Taking into account the appropriate factors for consideration, we are of opinion that the findings and conclusion of the trial court were fully justified and amply supported by the evidence in the case. The defendant was not in position to deny that his processes and methods were secret. His contract not to teach or divulge such methods is in itself an admission of a positive character that such methods were secret. S. Jarvis Adams Co. v. Knapp, 121 Fed. 34, 40. In a discussion of this subject, Callman in his work on Unfair Competition and Trademarks, 1945 Edition, Vol. 1, Sec. 53.3, p. 666, states: "Express agreement not to disclose any of the processes and methods * * * is a positive acknowledgment of the fact that such processes and methods are secret; the stipulation would otherwise be meaningless." Williston on Contracts, Revised Edition, Vol. V, p. 4626, says: "The owner of a secret on selling it, may effectively promise not to compete by making use of the process himself or divulging it to others. Indeed, the sale of a secret process as such carries with it the implied obligation not to disclose it to others." There are many cases which support the conclusion of the court and show a great variety of subjects entitled to protection as trade secrets. Some of them are: Sandlin v. Johnson, 141 F. (2d) 660; Larx Co. v. Nicol, 28 N. W. (2d) 705; International

News Service Co. v. Associated Press, 248 U. S. 215, 39 Sup. Ct. 68; F. W. Dodge Co. v. Construction Information Co., 183 Mass. 62, 66 N. E. 204; Pressed Steel Car Co. v. Standard Steel Car Co., 210 Pa. 464, 60 Atl. 4.

In the case of Board of Trade of the City of Chicago v. Christie Grain & Stock Co., 198 U. S. 236, 25 Sup. Ct. 637, 639, Justice Holmes, in discussing a similar problem, said: "In the first place, apart from special objections, the plaintiff's collection of quotations is entitled to the protection of the law. It stands like a trade secret. The plaintiff has the right to keep the work which it has done, or paid for doing, to itself. The fact that others might do similar work, if they might, does not authorize them to steal the plaintiff's. Compare Bleistein v. Donaldson Lithographing Co., 188 U. S. 239, 249, 250. The plaintiff does not lose its rights by communicating the result to persons, even if many, in confidential relations to itself, under a contract not to make it public, and strangers to the trust will be restrained from getting at the knowledge by inducing a breach of trust and using knowledge obtained by such a breach." There are other cases holding that absolute secrecy is not required and that others might have knowledge of a trade secret, but this is no defense to one who discloses the trade secret in violation of a contract. Vulcan Detinning Co. v. American Can Co., 72 N. J. Eq. 387, 67 Atl. 339, 342, 343; Radium Remedies Co. v. Weiss, 173 Minn. 342, 217 N. W. 339; Callman on Unfair Competition and Trademarks, 1945 Ed. Vol. 1, Sec. 53.3, p. 672.

Appellant contends that because other persons have for many years used internal culling of poultry, and the method is of general knowledge in the poultry industry, it is therefore not a trade secret. Citations in support of this contention are not in point. In the case of Brunson v. Reinberger & Collier, 203 S. W. 269, 134 Ark. 211, the court was unable to ascertain that the original trade secrets had been acquired from the plaintiff, and whether or not any confidence had ever been violated. In Sach v. Cluett, Peabody & Co., 31 N. Y. S. (2d) 718, the court held that trade secrets are property and will be protected in equity against unauthorized disclosures. In Godefroy Mfg. Co. v. Lady Lennox Co., 134 S. W. (2d) 140, the St. Louis Court of Appeals held there was an independent discovery by the defendant of its method, and no proof that defendant was in possession of plaintiff's secret formula. In Chadwick v. Covell, 151 Mass. 190, 23 N. E. 1068, the opinion recognized that a trade secret should be protected by courts of equity. In Southwest Specialties Co. v. Eastman, 130 Kansas, 443, 286 P. 225, the court said there was no express contract not to disclose the trade secret, and that there was in fact no trade secret involved.

While the validity of the contract in question must be determined by the law of the place where the contract was made, matters respecting the remedy depend upon the law of the place where the suit is brought.

Ruhe v. Buck, 124 Mo. 178, 183, 27 S. W. 412. In consideration of the remedy to which plaintiff is entitled, we then look to the law of Missouri where the rule is well established that secret formulas and processes are property rights which will be protected by injunction against those who through a breach of trust or a violation of confidence attempt to apply the secret to their own use or to impart it to others. Luckett v. Orange Julep Co., 271 Mo. 289, 196 S. W. 740; Germo Mfg. Co. v. Combs, 209 Mo. App. 651, 240 S. W. 872, 881; Charles Reilly Optical Co. v. Burke, 41 S. W. (2d) 909; Harrington v. National Outdoor Adv. Co., 355 Mo. 524, 532, 196 S. W. (2d) 786; Sandlin v. Johnson, supra. When trade secrets are involved the law of Illinois is in accord with the Missouri rule. Witkowsky v. Affeld, 283 Ill. 557, 119 N. E. 630; Victor Chemical Works v. Iliff, 299 Ill. 532, 547, 132 N. E. 806, 813.

An outstanding fact in this case, which appellant overlooks or ignores, is that the plaintiff purchased a business known as the Eames Institute of Poultry Technology with all the rights and privileges incident thereto. That business has been sponsored and developed at an enormous expense to plaintiff, and plaintiff has a property right which equity will protect against such an unlawful invasion as that attempted by defendant.

According to the authorities heretofore cited and having in mind the nature and extent of plaintiff's business, which is in effect nationwide, the judgment of the court is not unduly restrictive. In view of all of the foregoing the judgment should be affirmed. The Commissioner so recommends. *Sperry, C.*, not sitting.

PER CURIAM:—The foregoing opinion of BOYER, C., is adopted as the opinion of the court. The judgment is affirmed. *Dew, P. J.* and *Cave, J.*, concur; *Bland, J.*, absent.