FOOD PROCESSES, INC., Plaintiff,

v.

SWIFT & COMPANY and Trenton Foods, Inc., Defendants.

Civ. No. 1273.

United States District Court
W. D. Missouri,
St. Joseph Division.

Aug. 31, 1966.

Strauch, Nolan & Neale, Washington, D. C., Stinson, Mag, Thomson, McEvers & Fizzell, Kansas City, Mo., for plaintiff.

Brown, Douglas & Brown, St. Joseph, Mo., Margolin & Kirwan, Kansas City, Mo., Edward T. McCabe, Haight, Simmons & Hofeldt, Chicago, Ill., Fishburn & Gold, Kansas City, Mo., for defendants.

## MEMORANDUM OPINION, FINDINGS OF FACT, AND CONCLUSIONS OF LAW

DUNCAN, Senior District Judge.

Plaintiff, Food Processes, Inc., is a Virginia corporation, originally organized by Horace L. Smith and C. Olin Ball to hold title to U. S. Patent No. 2,541,113, the patent here in suit, of which Smith and Ball are the co-inventors. This patent is presently owned by plaintiff, subject to an exclusive license to Hupp Corporation, also a Virginia corporation. Pursuant to that license, this action was instituted in the name of plaintiff, Food Processes, Inc.

Defendant, Trenton Foods, Inc., is a Missouri corporation, having a regularly established place of business in Trenton, Missouri, in the St. Joseph Division of the Western District of Missouri.

Defendant Swift & Company is an Illinois corporation which maintains a place of business in St. Joseph, Missouri.

In its three count Complaint, filed June 26, 1964, plaintiff alleges that the following wrongful acts have been committed by the defendants, Swift and Trenton:

(1) Infringement of Claim 3 of Patent No. 2,541,113, which is owned by plaintiff;

(2) Unfair competition involving the misappropriation of plaintiff's trade secrets disclosed in confidence by plaintiff during the course of unfruitful license negotiations with Swift & Company with respect to Patent No. 2,541,-113;

(3) Conspiracy in violation of the anti-trust laws.

In their answer, the defendants deny the validity of the patent on the ground that the patent was known and used or patented or described in a printed publication in this or another country before the invention thereof by the applicants of the patent in suit. Invalidity is also alleged on numerous other grounds. In addition, the defendants deny that their accused process infringes the process described in plaintiff's patent. Defendants also deny that they are guilty of appropriating trade secrets of the plaintiff.

At the conclusion of the evidence, the court sustained a Motion to Dismiss as to defendant Trenton Foods, Inc., under Count 2, for misappropriation of trade secrets, and, as to both defendants, under Count 3, for violation of the anti-trust laws. Hence, the only issues now before the court are the alleged infringement of the patent by both defendants, under Count I, and the alleged misappropriation of trade secrets by Swift & Company, under Count 2. In view of our conclusions regarding the question of patent infringement, infra, we have determined that it is unnecessary for us to rule on the question of validity.

## COUNT I—PATENT INFRINGEMENT

Patent No. 2,541,113 was issued on February 13, 1951, upon the application of Smith and Ball, filed March 24, 1949. The patent discloses a "Process for Canning and Sterilizing Food Products". It is aimed at producing a product of improved quality by short heating at high temperature. The heating serves two purposes, it cooks the food product and it sterilizes. In this connection, the specifications recite that:

"The preservation of food in cans or like closed containers involves as an essential operation subjecting the food material to elevated temperatures for the purpose of destroying both pathogenic and spoilage organisms present therein. The spoilage organisms or bacteria encountered include not only such soil-borne and air-borne bacteria, molds and yeasts as may be present in or on the food, but also the organisms that are inevitably present in the air and on or in the can or other container in which the food is enclosed."

\* \* \* \* \* \*

"The thermal destruction of spoilage organisms is a function of both temperature and time, destruction at relatively high temperatures being effected within much shorter time intervals than are required at lower temperatures."

\* \* \* \* \* \*

"Prolonged heat treatment at temperatures above about 200°F. adversely affects the quality of the food with respect to flavor, consistency and color, and here the time factor is dominant— prolonged heating at moderate temperatures producing more marked deterioration than heating for short intervals at much higher temperatures."

\* \* \* \* \* \*

"It is accordingly necessary to the attainment of the desired product quality that sterilization be effected rapidly and at a temperature well above 212°F."

The Smith-Ball process embodied in the patent in suit is based upon the above facts which had been known in the industry for many years, i. e., that the use of high temperature for a short time would adequately sterilize the product and be less harmful to product quality than use of lower temperatures at the much longer times required for sterilization.

Thus, the idea of the patent was to utilize a very high temperature for a short time and to keep the food product and its container at sterilizing temperatures just long enough for sterilization, but no longer than necessary. To accomplish this, the patent teaches giving the food product most, but not all, of its sterilizing heat treatment prior to filling. Similarly, the cans and their lids are treated in a like manner. The patent states:

"The product at filling temperature is filled into the partially presterilized cans 60 and these cans are closed by the partially presterilized lids 57 in the closing machine. The product at the time of filling is sterilized to the extent of from about 50 to 97% and preferably from about 70 to 95%. This means that the heat treatment to which the product has been subjected at the time of filling is from 50 to 97% or preferably from 70 to 95%, of that required for complete sterilization. The cans 60 and the lids 57 are preferably similarly partially sterilized at the time of filling and closing, although they may be completely sterilized at this time if desired."

The filled and sealed cans are then held at sterilizing temperature for a sufficient time to complete the sterilization of the food product, the cans and the lids. The specifications thus recite:

"The canned product at substantially the filling temperature is held for a time interval of from 10 seconds to 5 minutes and preferably from 10 seconds to 2 minutes in order to complete the sterilization of the product and the containers in which it is enclosed."

The specifications explain the purpose and advantages of its process of (a) heating to a high temperature; (b) filling into partially sterilized cans; and (c) filling at a sterilizing temperature and holding at that temperature just long enough to complete sterilization, in the following manner:

"In the process of our invention, heat deterioration of the food product is minimized or avoided by using very high temperatures and short time intervals to accomplish sterilization."

\* \* \* \* \* \*

"The time interval during which the product is held at high temperatures is minimized both by using the extremely high maximum temperature step, which destroys spoilage organisms at an accelerated rate, and by utilizing the time necessarily consumed in filling and closing the cans to continue sterilization at a relatively high temperature, which, although lower than the maximum temperature, is still above the boiling point of the product liquid at atmospheric pressure. By partially pre-sterilizing the cans and their covers prior to filling, the containers are filled at a point when both product and containers are partially sterilized to approximately the same degree, whereby completion of the sterilization operations takes place simultaneously with respect to both the food product and the containers, and the food product is not maintained at an elevated temperature for any longer than is necessary to complete the sterilization."

There are nineteen Claims in the patent *in suit*. Claim 3, the only one with which the defendants are charged with infringing, provides:

"A process for canning and sterilizing a low acid food product which comprises rapidly heating the product in bulk and with *agitation* and under superatmospheric pressure high enough to prevent boiling of the product liquid to a maximum temperature of from 260 to 310°F. within a time interval of from 10 to 180 seconds, cooling the

product from such maximum temperature to a filling temperature of from 230 to 270°F. and in a time interval of from 5 to 60 seconds, filling and sealing the so treated product while under superatmospheric pressure above the boiling point of the product liquid at such filling temperature into *partially* sterilized containers, holding the filled and sealed containers under such superatmospheric pressure and substantially at the filling temperature for an interval of from 10 seconds to five minutes and then cooling the product while under such superatmospheric temperature to a temperature within approximately 15°F. of the boiling point of the product liquid at atmospheric temperature in a time interval of from 10 seconds to 5 minutes." [Emphasis supplied].

Claim 3 has been separated into five "steps" for the purpose of determining the question of infringement. They are:

*Step 1*: "Rapidly heating the product in bulk and with *agitation* and under superatmospheric pressure high enough to prevent boiling of the product liquid to a maximum temperature of from 260 to 310°F. within a time interval of from 10 to 180 seconds." [Emphasis supplied].

*Step 2*: "cooling the product from such maximum temperature to a filling temperature of from 230 to 270°F. and in a time interval of from 5 to 60 seconds."

*Step 3*: "filling and sealing the so treated product while under superatmospheric pressure above the boiling point of the product liquid at such filling temperature into *partially* sterilized containers," [Emphasis supplied].

*Step 4*: "holding the filled and sealed containers under such superatmospheric pressure and substantially at the filling temperature for an interval of from 10 seconds to 5 minutes."

*Step 5*: "cooling the product while under such superatmospheric temperature to a temperature within approximately 15°F. of the boiling point of the product liquid at atmospheric temperature in a time interval of from 10 seconds to 5 minutes."

The record discloses that the history of plaintiff's patent, since it was granted on February 13, 1951, has been one of abject failure. In fact, the only license ever granted by the patentees for the commercial development of their process was to the Beatrice Foods Company, La-Choy Division, of Archbold, Ohio. This license agreement was entered into in 1949. (As was stated above, the license granted to Hupp Corporation by plaintiff was for the sole purpose of maintaining this suit.)

Under the license granted to Beatrice Foods, an experimental unit was constructed at its LaChoy Division in Archbold, Ohio, comprised of a pressure room and other equipment to practice the process. Early runs of the process provided good food quality but did not provide sterilization. Later, when sterilization was achieved, the texture and firmness of the food product was impaired. Moreover, other problems, such as exploding of the material, discoloration of the food product, and short shelf life, were encountered. Finally, in 1954, after the expenditure of approximately $400,000.-00, Beatrice's equipment was scrapped and sold for junk, for approximately $3,500.00. At no time did the process achieve commercial use.

Both prior and subsequent to the license agreement with Beatrice, other numerous efforts were made by the patentees to interest other food processors in their process. On May 26, 1950, there occurred the first contact between Smith and personnel of Swift & Company, in Chicago, for this purpose. Subsequently, Swift & Company, and Smith and Ball, entered into extensive discussion and negotiation regarding the granting of a license by Smith and Ball to Swift for the commercial use of their process.

In this connection, Swift made one inspection of the LaChoy plant, and it was not then in operation. Finally, however,

negotiations between Swift and Smith and Ball were concluded on September 29, 1953, without any arrangements having been made between them. (This subject will be discussed in greater length in disposing of the claim for misappropriation of trade secrets under Count II, infra).

After termination of the above negotiations, Swift engaged in extensive experimentation, on their own, in the area of food canning, which involved substantial expense. In this connection, the record reveals that Swift decided to construct a pilot plant in Chicago, in 1955; the construction thereof was completed in 1957; testing of various HTST systems in the pressure room began in 1958; and, this testing continued through 1959 and 1960. Thereafter, Swift's experiments were continued by Trenton Foods which was licensed for this purpose by Swift, on June 15, 1961.

In this connection, the record reveals that Trenton Foods constructed a plant in Trenton, Missouri, and expended an additional large sum of money in testing and experimentation, for a period of approximately three years, until February, 1964, when Swift and Trenton Foods announced the development of the accused Flash 18 process, in the following statement:

"The new process canning represents the first basic change in food canning since it was introduced in the days of the Napoleonic wars.

There are some high temperature systems in use commercially, but they are primarily designed and used only for liquids * * * juices, milk, sauces. The new process extends to a much wider range of foods.

This new process retains delicate flavors, homemade texture and appearance in a large variety of canned foods to a degree not possible under conventional canning.

The rapid heating to above sterilization temperature does away with the necessity for the prolonged cooking period.

Elimination of the long cooking time normally associated with canning, plus the 'flash' action in the deaerator are the keys to the improved taste and texture of the new Flash 18 process canned products."

After a careful review of the record in this case, it is our determination that the accused Flash 18 process is the result of the aforesaid approximately 10 years of experimenting and testing, by trial and error, on the part of Swift and Trenton Foods, involving expenditures by them of hundreds of thousands of dollars, before a successful commercial product was produced.

■ The law governing questions of patent infringement in this Circuit was clearly stated by the Court of Appeals for the Eighth Circuit, as follows:

"To sustain the charge of infringement, the infringing device must be substantially identical with the one alleged to be infringed in (1) the result obtained; (2) the means of attaining that result; and (3) the manner in which its different parts operate and cooperate to produce that result. If the devices are substantially different in either of these respects the charge of infringement is not sustained." Electric Protection Co. v. American Bank Protection Co., 8 Cir., 1910, 184 F. 916, 923.

This rule was quoted and followed in General Bronze Corp. v. Cupples Products Corp., 8 Cir., 1951, 189 F.2d 154, 159; and Ronson Patents Corp. v. Sparklets Devices, Inc., 8 Cir., 1953, 202 F.2d 87, 93.

■ In order to resolve the issue of patent infringement, the above denominated steps of Claim 3 of the patent in suit, the only claim of said patent herein involved, must be compared to the corresponding steps of the accused process, in the above ways. It is to this task that we now turn. The claim must, of course, be read in the light of the specifications, whenever necessary for clarity.

### STEP 1 OF CLAIM 3:

The first step of Claim 3 provides for: "Rapidly heating the product in bulk and with agitation." The specification with respect to it states:

"* * * In accordance with our process, the food product in bulk is rapidly *heated uniformly throughout* to a high maximum temperature * * *" [Emphasis supplied].

In his deposition, Smith explained that rapid uniform heating was desired, in their process, so that each portion of each particle would receive maximum heat treatment, and no portion would have to be overcooked in order to give the required heat treatment to any other portion.

The record reveals that, at Trenton, the typical product is not "heated uniformly throughout." In fact, the accused process provides for exactly the opposite method of heating, wherein a heat lag in the center of the particles is considered desirable in order to avoid an explosion of the discrete food particles which, they found, occurs during the flash cooling operation, when uniform heating is employed.

Indeed, this was, similarly, the result at plaintiff's LaChoy plant, where fast uniform heating, in accordance with the teaching of the patent was practiced. This was one of the major problems encountered at LaChoy which led to the cessation of experiments with the patent in suit, by that licensee.

At Trenton, on the other hand, this uniform method of heating and the resultant explosion, are avoided. There, the entire food product and its container are sterilized, after filling and sealing have been completed and uniform heating of each particle prior to filling is, therefore, both unnecessary and undesirable. We find the foregoing distinction between the two processes in suit to be one of substance.

Another major distinction between the two processes is the requirement of Step 1 of Claim 3 that the heating be "with agitation". The purpose of agitation, in this step, is to get all particles of the food product in contact with the heating surface of the heating elements, so that the patent's desired uniform heating can be achieved. This procedure is referred to in the specifications as follows:

"In accordance with our process, the food product in bulk is rapidly heated uniformly throughout to a high maximum temperature, substantially above the atmospheric boiling point of the product liquid and within a time interval less than that required for sterilization. This initial heating is preferably carried out with agitation which may comprise circulation and may be carried out either in a closed container through which the product is continuously fed under a pressure sufficient to prevent boiling of the product liquid during the heating operation, or in a closed pressure vessel in which successive batches of the food product are treated in bulk."

Although the specifications mention the possibility of heating by means other than steam jackets, the illustrated and preferred procedures utilize jackets about the heaters filled with steam. When such heaters are utilized, it is essential that the product be kept in constant and vigorous, if not violent agitation. A purpose of the agitation, in this step of Claim 3, is to get the food product in contact with the heating surfaces so that the uniform heating which the patent teaches can be achieved.

In the Trenton process, on the other hand, steam injection heating is employed. This method obviates the necessity for agitation during heating, which, according to the Trenton theory, is undesirable since it leads to breakup of the food particles.

### STEP 2 OF CLAIM 3

The second step of Claim 3 consists of "cooling the product from such maximum temperature to a filling temperature of from 230 to 270°F. and in a time interval of from 5 to 60 seconds". The specifications require the cooling period to be between 5 and 60 seconds, and pref-

erably, in the range of 5 to 30 seconds. The record reveals the procedure utilized at Trenton to be inconsistent with the requirements of this step of Claim 3, in that the "flash cooling" employed at Trenton does not occur within the time limitation required in the claim.

As discussed above, the theory of the patent is to heat the product uniformly throughout. In order to avoid explosion of the discrete food particles during cooling, it was found necessary to slightly retard the cooling procedure to within the time limitation set forth in Step 2 of Claim 3. At Trenton, however, product explosion is eliminated by not heating the product uniformly throughout, as discussed above. "Flash cooling" is thus able to be achieved, in the latter process, instantaneously.

Plaintiff has attempted to negate the above substantial inconsistency between the patent in suit and the accused process by arguing that 45 to 90 seconds should be added to Trenton's cooling time, which period allegedly represents the time during which the food is traveling in a pipe between the heater and the entrance to the deaerator. It is plaintiff's contention that since the pipe is not insulated, the approximate one or two degree loss of heat which occurs through the walls of the pipe should be included in determining the cooling time. If this were done, it is urged, in most instances, cooling would take place within the 5 to 60 seconds specified in Claim 3.

In this connection, we feel the plaintiff has ignored the fact that, in addition to the above loss of temperature, occurring in the pipe, there will be a similar slight loss of temperature by the product after it has undergone "flash cooling", and while it is allowed to stand in the bottom of the deaerator prior to filling. It is clear that to include it would be to raise Trenton's cooling time to over 150 seconds—well outside the time limitation of Claim 3. The crux of this matter is, simply, that plaintiff is mistaken in its calculation of what might constitute "cooling time" for the purpose of Claim 3.

We find it unnecessary to determine the correct interpretation of this clause because it is clear that neither of the possible alternatives can aid plaintiff in its present allegation, i. e., either the language of Claim 3 must be taken to mean the effective cooling, in which case, Trenton's "time" is instantaneous, or, it should be more literally construed to mean the total time between the maximum temperature in the heater and the fill temperature as the product enters the cans, in which case, Trenton's "time" is over 150 seconds. In any event, we are unable to agree with plaintiff's interpretation of what constitutes "cooling time", in this connection. Plaintiff, clearly, cannot have it both ways in order to achieve it's desired result.

### STEP 3 OF CLAIM 3.

The third step of Claim 3 consists of:

"filling and sealing the so treated product while under superatmospheric pressure above the boiling point of the product liquid at such filling temperature into *partially* sterilized containers". [Emphasis supplied]

This step is clarified in the specifications as follows:

"The product at the time of filling is sterilized to the extent of from about 50 to 97% and preferably from about 70 to 95%. This means that the heat treatment to which the product has been subjected at the time of filling is from 50 to 97% or preferably from 70 to 95% of that required for complete sterilization. The cans 60 and the lids 57 are preferably similarly partially sterilized at the time of filling and closing, although they may be completely sterilized at this time if desired."

Dr. Ball further characterized this process, at the trial in the following manner:

Q "And by partially presterilized you mean that the cans have been heated to a desired sterilization temperature and it has been at that temperature for some time short of the time you desire for full sterilization?"

A "Yes."

And, further:

Q "Now, you also have the sterilization in a plurality of stages. Not only must there not be too long a time interval between the two stages but also there must be provision so there won't be recontamination between stages?"

A "Yes, for the cumulative effect without modification to prevail, yes."

In the Trenton process, the unfilled cans are not subjected to any heat treatment or washing. Rather, at this stage, they are subjected to a White Cap air blast cleaner, which is utilized to blow dust, dirt, and carton debris out of the cans.

The question thus presented, in regard to this step of Claim 3, is whether this White Cap air blast cleaner renders the cans "partially sterilized" within the meaning of the patent, allowing it to be viewed as analogous to Step 3.

In this connection, Dr. Stein, of the Department of Agriculture (MID), testified in his deposition that the regulations of the MID require some sort of cleaning process to be administered to the cans before they are filled, and that an air blast, such as that employed in the Trenton process, suffices for this purpose. He further testified that it would be erroneous to call such an air blast cleaner a sterilizer.

In support of plaintiff's contention that the White Cap air blast cleaner constitutes "partial sterilization" within the requirements of Claim 3, it cites the "Brandley Report". Suffice it to say, in this connection, that the evidence substantially shows that this report has been accepted in the industry as "quite unsound scientifically". We feel compelled to agree with the industry view.

We therefore hold that the Trenton process of complete sterilization of both the can and the food product subsequent to filling and sealing, by subjecting the cans to a longer heating process, at that time, differ substantially from the requirements of Step 3 of Claim 3 of the patent, which teaches partial presterilization, as outlined above.

STEP 4 of CLAIM 3 provides for:

"holding the filled and sealed containers under such superatmospheric pressure and substantially at the filling temperature for an interval of from 10 seconds to 5 minutes"

The patent teaches that the hold at filling temperature should preferably be from 10 seconds to 2 minutes. The outside range provided for in Step 4 of Claim 3 is 10 seconds to 5 minutes.

At Trenton, however, the holding time in the afterheater conveyor is, at least, 7 minutes, with some products being so held for a maximum of 9 minutes.

Plaintiff contends, in this connection, that a period of 5 minutes is sufficient to bring about full sterilization, and that the extra time employed at Trenton, for this purpose, is, therefore, superfluous, and not inconsistent with the patent. The record is clear, however, and there is no evidence to the contrary, that in testing this step, at Trenton, it was found that a holding time of 5 minutes or less produced spoilage of 1% or more. This is considered an excessive rate of spoilage under modern canning conditions.

In asserting that a holding period of 7 or 8 minutes is "not necessary", plaintiff disregards the problems of spoilage which Trenton actually experienced, where the product was held for a shorter time, and relies, instead, on the theory and its calculation of $F_0$ numbers. ($F_0$ is used as a comparative symbol in evaluating the thermal death curve in various processes for various products in various can sizes).

In this connection, plaintiff postulates that "only 5 minutes is required for any product which is at least 248°F." It is apparent, however, that plaintiff errs, in its calculation, by using a holding temperature of 248°F. to arrive at its conclusion. In fact, the minimum temperature of the product, at Trenton, during the hold period, is, 246°F., not 248°F., as suggested by plaintiff, and in any such sterilization process, it is the minimum

roduct where the lowest temperature exists.

Finally, in this connection we must consider the testimony of witness Reed, who, after reviewing the Trenton process, considered that an 8 minute holding period (and in some cases, 7) would be sufficient to safeguard against spoilage and hazard to health, whereas a 5 minute maximum hold, as required by Step 4 of Claim 3 of the patent, would be insufficient for this purpose, in the Trenton process.

In light of these reasons, we must hold that the Trenton process is inconsistent with Step 4 of Claim 3, and is not an infringement thereof.

The fifth and final step of *Claim 3* consists of:

"cooling the product while under such superatmospheric temperature to a temperature within approximately 15°F. of the boiling point of the product liquid at atmospheric temperature in a time interval of from 10 seconds to 5 minutes."

We find that plaintiff's efforts to prove consistency between the two processes, in this regard, by its Exhibits PX 58A–58I, and the testimony of its expert, Fishleigh, are unpersuasive and insufficient to sustain its burden of proof.

## CONCLUSION

It is evident, from the foregoing analysis, that the variations between the Flash 18 process and the Smith-Ball process are not consistent with their being the same thing. Consequently, the failure of the plaintiff to prove infringement is clear. To summarize, we find the following compelling inconsistencies between the two processes:

(1) The Smith-Ball process was and is a failure, whereas, the Flash 18 process is commercially successful.

(2) The Flash 18 process maintains the product at sterilizing tempera-

tures for over 12 to 14 minutes, 3 or 4 times what is shown in the patent.

(3) The Smith-Ball process aims at rapid heating uniformly throughout, whereas, in the Flash 18 process, there is a heat lag in the center of discrete particles of food; a result of this difference is that, in the Flash 18 process, there is no problem of exploding products, which so plagued the LaChoy operation.

(4) The Smith-Ball patent contemplates agitation during heating, whereas, in the Flash 18 process, agitation is held to an unavoidable minimum.

(5) The Smith-Ball patent seeks rapid cooling to filling temperature, in no more than 60 seconds, and, preferably, in no more than 30 seconds, whereas, in the Flash 18 process, the flash cooling is instantaneous and the total cooling time is more than 2½ minutes.

(6) The Smith-Ball patent requires, at least, partial presterilization of the cans and the covers, whereas, in the Flash 18 process, there is no such presterilization of either cans or covers, but only air cleaning, which is in no sense equivalent to the high temperature, high pressure steaming which the patent teaches.

(7) The Smith-Ball patent teaches a "holding period" of the sealed cans of no more than 5 minutes, and, preferably, less than 2 minutes, whereas, in the Flash 18 process, there is a "holding period" of from 7½ to 9 minutes, which results in a "double sterilization treatment of the food", which the Smith-Ball patent seeks to avoid.

It is thus our conclusion that while the result of the accused Flash 18 process is substantially the same as that sought to be obtained under the patent, the method of obtaining such result is

substantially different and does not infringe. Electric Protection Co. v. American Bank Protection Co., 184 F. 916 (8 Cir. 1910); General Bronze Corp. v. Cupples Products Corp., 189 F.2d 154 (8 Cir. 1951); Ronson Patents Corp. v. Sparklets Devices, Inc., 202 F.2d 87 (8 Cir. 1953).

## COUNT II: MISAPPROPRIATION OF TRADE SECRETS:

As heretofore stated, in the discussion of the question of infringement, supra, the application for the patent in suit was filed by Smith and Ball on November 24, 1949, and issued on February 13, 1951.

While the patent application was pending, Smith and Ball granted a license to Beatrice Foods, Inc., and entered into an agreement with them for the purpose of conducting experiments in the field of canning low acid food products in accordance with the Smith-Ball process. This agreement provided for the construction of a plant, for this purpose, at Beatrice's LaChoy Division location, in Archbold, Ohio. The costs of the construction and experimentation were to be borne by the licensee.

It is alleged in Count II of the instant Complaint, that in the course of the subsequent experimentation at the LaChoy plant, certain valuable improvements were made in the structure disclosed in the patent in suit, and that under the terms of the foregoing agreement, these were to be the property of the plaintiff. Specifically, these improvements were alleged to include the relocation of the product heater portion of the pressure chamber outside of the pressure room; the development of novel product transfer devices for transferring the product into the product heater portion of the pressure chamber, and thence, to the pressure room portion of the press chamber; and, improvements in the equipment for flash cooling the product during its transfer into the product heater and, thence, to the pressure room portion of the pressure chamber.

It is plaintiff's contention that, in 1952, Dr. H. S. Mitchell, Director of Laboratories for Swift, together with a large group of Swift employees, made an inspection tour of the LaChoy operation, and there received, in confidence, full information regarding the structure and operation of the equipment for the then existing installation. It is alleged that this tour and accompanying confidential disclosures constitute Swift's first introduction to the high temperature short time holding process (HTST) and pressure room canning procedures disclosed by the patent in suit.

Plaintiff contends that, following the above disclosures, Swift requested a contract proposal from plaintiff for the use of the Smith-Ball process, and that negotiations, in this connection, continued until September 29, 1953, when they were terminated without result. Thereupon, it is alleged, Swift erected a pilot plant, in Chicago and engaged in their own research project for the development of the Smith-Ball process, of which they had become apprised as a result of their inspection of the LaChoy plant.

The Swift project resulted in the application and granting of a patent to Warren R. Schock and Wayne E. Livingston, in February 1966, which was then assigned to Swift & Company. Subsequently, it is alleged, Swift secretly executed a patent and "know-how" license to defendant Trenton Foods, Inc., relating to a pressure room canning process. Further experimentation by Trenton resulted in the accused Flash 18 process.

The confidential information and trade secrets of plaintiff's, which were allegedly obtained by Swift as a result of its negotiations with Smith and Ball and its inspection of the LaChoy plant, are specified in Count II of the Complaint, as follows:

"(a) The fact that superior quality of product did in fact result from the practice of the process;

(b) The cost of constructing an installation to practice the process;

(c) The flash cooling of a low acid food product from a high sterili-

zation temperature to a lower sterilizing temperature with resultant product deaeration in the practice of the process of the patent in suit;

(d) The semi-circular cross section of the pressure room in which the filling and sealing of the containers actually takes place;

(e) The approximate size of the pressure room required for the process.

(f) The equipment layout in the pressure room.

(g) The tolerability of superatmospheric pressures by personnel and the restrictions on pressures and rates of changes of pressure for personnel.

(h) The air conditioning of a pressure chamber.

(i) The provision for intercommunication between the interior and exterior of the pressure chamber."

It is contended that all of these alleged "trade secrets", except the size of the pressure room, have been misappropriated by the defendants and are embodied in the accused Flash 18 installation.

The record reveals that, during the course of the construction of the LaChoy plant, which was an experimental unit constructed for the purpose of testing and developing the Smith-Ball process, substantial publicity was given to the general subject by the patentees. Dr. Ball and others interested in the process had discussed it at public meetings and, quite naturally, were making every possible effort to sell their new process to the food canning industry.

As heretofore stated, the idea of high temperature short time canning, (HT ST), under high pressure, was definitely not new to the industry. Indeed, it had been discussed in numerous patents for many years, including those that had been issued to Dr. Ball and Mr. Smith. In this connection, it is clear that all of the elements incident to high

temperature short time holding were not new to the industry; rather it was the techniques and methods for putting into operation and practice what was known previously concerning HTST, that were still indefinite and undeveloped, at this time.

It is also clear from the record, that, at least 25, and, perhaps, 80 people were invited to and did visit the LaChoy plant during the time it was being constructed and was in operation. However, there is no evidence, whatever, that it was ever suggested to any of these visitors, including those from Swift, that either the information that was expressly related to them, or anything obvious that they, themselves, might perceive, was regarded by the plaintiff as confidential or within the realm of "trade secrets". This is true even in regard to the diagram of the LaChoy plant which it is alleged was delivered to a representative of Swift & Co., thereby revealing the mechanical elements in the plant.

Moreover, there has never been a contention on the part of the plaintiff that it advised any such visitor to the LaChoy plant of the confidential nature of that operation, or that any information that they would receive was to be considered a "trade secret". Indeed, there is no evidence in the record that the plaintiff, itself, regarded the LaChoy operation as confidential and containing "trade secrets", until after the filing of this lawsuit.

 Finally, the record also reveals that during the period when the defendants' representatives, together with other interested parties, were visiting the LaChoy plant, all of the information with respect to plaintiff's canning process had already been revealed either in the application for the patent in suit, or the patent, itself, as the patent was issued in 1951; and, we are unable to find from the evidence, any substantial departures from the teachings of the patent which might have been obvious to the visitors to the LaChoy plant. In this connection, we are cognizant of the law regarding implied notice of trade secrets and that

a confidential relationship is implicit in license negotiations. Hoeltke v. C. M. Kemp Mfg. Co. (CCA 4, 1935) 80 F.2d 912, cert. den. 298 U.S. 673, 56 S.Ct. 938, 80 L.Ed. 1395; Jones v. Ulrich (Ill.App. Ct. 3rd Dist. 1950) 342 Ill.App. 16, 95 N.E.2d 113, 117, 118; Sandlin v. Johnson, 152 F.2d 8, 11 (8 Cir. 1945). However, we feel that the facts in this case prevent our present indulgence in any such inference.

Our examination of plaintiff's specific allegations of trade secrets, which, it is contended, have been misappropriated by the defendants, further impels the conclusion that no violations, in this connection, have, in fact, occurred.

The first alleged misappropriated trade secret specified in the Complaint is: "(a) The fact that superior quality of product did in fact result from the practice of the process". We fail to find any basis for considering this a trade secret because at the time Swift inspected the LaChoy plant and took part in negotiations, regarding the Smith-Ball process, that process had not even produced a product suitable for commercial distribution. Moreover, the record reveals that, at no time, was such a product produced at LaChoy by the Smith-Ball process. Indeed, we feel there is a complete lack of evidence in the record which indicates that a "superior quality of product did in fact result from the practice of the (Smith-Ball) process," at any time.

The second alleged misappropriated trade secret specified in the Complaint is: "(b) The cost of constructing an installation to practice the process". In this connection, plaintiff's testimony regarding the cost figures they disclosed to Swift differs substantially from the actual cost of the LaChoy installation, as revealed in the record. In any event, we are unable to ascertain how the cost of a plant might be considered a confidential trade secret, in any sense.

The third alleged misappropriated trade secret specified in the Complaint is: "(c) The flash cooling of a low acid food product from a high sterilizing temperature to a lower sterilizing temperature with resultant product deaeration in the practice of the process of the patent in suit". With respect to this allegation, we find nothing in the evidence which convinces us that anything was revealed to Swift at the LaChoy plant which differs, in any respect, from the description of the Smith-Ball process, which is stated in the patent, itself.

And, as heretofore stated, even assuming there were other matters revealed to Swift at this time, there is no evidence that they were, in fact, revealed in confidence by plaintiff and intended by them to be considered a trade secret by Swift.

Rather, we find the evidence compelling to the effect that all disclosures regarding the Smith-Ball process made to Swift and others, in the course of negotiations with them as prospective licensees of the patent in suit, were revealed openly, freely, and with no restrictions, express or implied.

The fourth alleged misappropriated trade secret specified in the Complaint is: "(d) The semi-circular cross section of the pressure room in which the filling and sealing of the containers actually takes place".

In this connection, the record is clear, again, that the area specified in this allegation was likewise revealed to Swift and other prospective licensees of the Smith-Ball process, which were invited to visit the LaChoy installation, without a single suggestion that it was a confidential trade secret.

It is, therefore, our conclusion that plaintiff did not intend such disclosure to be considered as confidential at the time these parties viewed it. In addition, the evidence reveals that the pressure room at Trenton, which is utilized in the accused process, is not semi-circular, but is completely circular. Moreover, it is larger in size, measuring 16' x 110', than was the pressure room at LaChoy, and, in many other respects, is substantially different. Thus, we conclude that, in no sense, can it be said that the fourth alleged trade secret specified in the Complaint

has been misappropriated by the defendants, even assuming that it does, in fact, constitute a trade secret.

The fifth alleged misappropriated trade secret specified in the Complaint is: "(e) The approximate size of the pressure room required for the process". In this connection, the evidence reveals that the pressure room at the LaChoy plant measured 16' x 40', which, as heretofore stated, was smaller than the pressure room utilized at Trenton, in the practice of the accused process.

In our opinion, the exhibits and evidence of both the plaintiff and defendants demonstrate, abundantly, that the latter pressure room bears little similarity to the pressure room at LaChoy, in size and other respects, except in the function both perform. Plaintiff has thus been unable to sustain its allegation that its pressure room at LaChoy, assuming it does constitute a trade secret, has been misappropriated by the defendants.

The sixth alleged misappropriated trade secret specified in the Complaint is: "(f) The equipment layout in the pressure room". In this connection, it is our determination, after examining the record, that the equipment layout in the unsuccessful, experimental pressure room at LaChoy bears slight similarity to the equipment in the modern, highly developed and commercially successful pressure room at Trenton, and therefore, even assuming this specification does constitute a trade secret, plaintiff has not sustained its allegation that it has been misappropriated by the defendants.

The seventh alleged misappropriated trade secret specified in the Complaint is: "(g) The tolerability of superatmospheric pressures by personnel and the restrictions on pressures and rates of changes of pressures for personnel". We feel that, in no sense, can this be viewed as a trade secret. In this connection, the evidence reveals that the superatmospheric pressures under which human beings may work has long been a subject that is understood by industry, generally. In fact, the legislatures of a number of states have legislated on this subject, defining to what extent persons may be enabled to work under superatmospheric pressure, and the conditions under which they may be required to work.

The pressure under which personnel worked in the pressure room at the LaChoy plant was less than 18 pounds per square inch, and in light of the fact that it was commonly known that this was a "safe" pressure under which men could work, it cannot be regarded as a trade secret. In fact, legislation exists in several states, governing the operation of personnel at elevated pressures, which permits a normal eight hour working day at up to pressures of 20 pounds per square inch.

The eighth alleged misappropriated trade secret specified in the Complaint is: "(h) The air conditioning of a pressure chamber". In this connection, we are altogether unable to ascertain in what manner the air conditioning of a chamber might be considered a trade secret, in light of the fact that air conditioning, adaptable to almost any type of enclosed structure, has been an established scientific fact for many years. Clearly, its application to a pressure chamber cannot be a trade secret.

The ninth and last alleged misappropriated trade secret specified in the Complaint is: "(i) The provision for intercommunication between the interior and exterior of the pressure chamber". In this connection, it is at once apparent that devices for this purpose (telephone and portholes) involve only a common mechanical knowledge and ability, and in no sense, can be regarded as trade secrets. Their installation involves simply employing persons familiar with such devices. Moreover, it is clear that the idea underlying the installation of such communication involves little imagination and is, likewise, not a trade secret.

## CONCLUSION

The Restatement of the Law of Torts, Sec. 757(b) defines "trade secret" in the following manner:

"It may be a device or process which is clearly anticipated in the prior art

or one which is merely a mechanical improvement that a good mechanic can make. Novelty and invention are not requisite for a trade secret as they are for patentability."

This section further states:

" \* \* \* a substantial element of secrecy must exist, so that, except by the use of improper means, there would be difficulty in acquiring the information. An exact definition of a trade secret is not possible. Some factors to be considered in determining whether given information is one's trade secret are: (1) the extent to which the information is known outside of his business; (2) the extent to which it is known by employees and others involved in his business; (3) the extent of measures taken by him to guard the secrecy of the information; (4) the value of the information to him and to his competitors; (5) the amount of effort or money expended by him in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others".

█ The rule in Missouri, in regard to trade secrets was laid down in Sandlin v. Johnson, 141 F.2d 660 (8 Cir. 1944), as follows:

"The rule in Missouri, as well as generally, is that, though a trade secret be unpatentable, it will nevertheless be protected from use or disclosure by one to whom it has been revealed in confidence."

It is clear from the foregoing, that an essential element of a "trade secret" is that it be "revealed in confidence" to the party accused of misappropriation. In this case, as heretofore stated, there is no suggestion of this in the record. Neither can we agree that there was an implied understanding between the plaintiff and Swift that the specified revealed information was to be held in confidence.

█ Our difficulty in this regard, is that at least 25 other prospective licen-sees of the Smith-Ball process, and, perhaps, more, were invited to the LaChoy plant for the purpose of viewing the process and interesting them in it. There is no evidence in the record that any of them, including Swift, were ever advised by plaintiff or by Beatrice Foods, which owned the installation, that they were there in a confidential capacity. We are not unmindful of the rule that:

"The plaintiff does not lose its rights by communicating the result to persons, even if many, in confidential relationship to itself, \* \* \*" Ultra-Life Laboratories v. Eames, 240 Mo. App. 851, 221 S.W.2d 224 (1949); Board of Trade of City of Chicago v. Christie Grain & Stock Co., 198 U.S. 236, 25 S.Ct. 637, 49 L.Ed. 1031 (1905). However, as we have seen, the essential element of confidential relationship is lacking in the case at bar.

█ Finally, we should reiterate our general conclusion, as heretofore stated in our discussion of the patent infringement issue, supra, regarding the exact nature of the relationship between the accused Flash 18 process and the Smith-Ball process, as we feel the record discloses it to be.

In this connection, we believe the evidence is clear that the plant at Trenton, as well as the Flash 18 process, are the result of approximately ten years of experimentation and testing by trial and error, on the part of both Swift and Trenton Foods, which involved expenditures by them of hundreds of thousands of dollars, before the commercially successful Flash 18 process was developed. Moreover, this did not occur until more than ten years after the termination of the negotiations between Swift and the plaintiff wherein the alleged trade secrets were revealed.

In light of the foregoing, it is our conclusion that plaintiff is not entitled to recover on the second count of its Complaint, and the Complaint is hereby dismissed.

It is so ordered.